# In the United States Court of Federal Claims

No. 21-1415

Filed: December 3, 2024

|  |  |
|---|---|
| BOARD OF SUPERVISORS OF ISSAQUENA COUNTY, MISSISSIPPI, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) ) |
| Defendant. | ) ) |

*Ronald Johnson, IV*, Deakle-Johnson Law Firm, Hattiesburg, MS, for plaintiff.

*Brian R. Herman*, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., for defendant.

**OPINION AND ORDER**

**SMITH**, Senior Judge

      Issaquena County, Mississippi's federally intensified floods allegedly commenced in 1979. Waters rose again in 1983, then again in 1984, and once more in 1993. Seemingly lingering longer than each one prior, the almost yearly deluges returned in 1997, in 1998, in 2002, in 2003, and in 2005. So frequently did the Mississippi Delta's waters rise that news of their return were paradoxically both commonplace and newsworthy in 2008. Yet, the Delta's ebb and flow did not relent, when in 2009, in 2011, and in 2013, the floodwaters overtook the County anew. Finally, the Mississippi Delta overflowed between 2018 and 2019, prompting the Board of Supervisors of Issaquena County, Mississippi (the "Board") to bring this lawsuit.

      The Board claims the unrelenting floods—of which the 2018/2019 inundation is the most recent episode—are exacerbated by Army Corps of Engineers' 1978 levee system, the Yazoo Backwater Project, because it inhibits the Mississippi Delta's natural topographic drainage system. *See generally* Second Amended Complaint, ECF No. 27 [hereinafter Second Am. Compl.]. In turn, the Yazoo Backwater Project has produced, since the 1979 flood, larger and more prolonged flooding that has harmed or destroyed the Board's property within the County, thereby triggering a taking under the Fifth Amendment to the United States Constitution. *Id.* at 10–13.

Even if the Board's Fifth Amendment claim is meritorious, a doubtful outcome, the Board is nonetheless tardy in asserting it.  The Tucker Act's statute of limitations, providing only six years to a plaintiff to assert its cause of action, prevents review of the Board's forty-five-year-old claim arising from the Yazoo Backwater Project's construction and operation.  28 U.S.C. § 2501; *see John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 135 (2008) ("Over the years, the Court has reiterated . . . the more absolute nature of the court of claims limitations statute."); Defendant's Motion to Dismiss at 13–18, ECF No. 30 [hereinafter Def.'s Mot.].  The Court's subject-matter jurisdiction bar is thus in effect, and the Board's claim must be dismissed for that reason.  *See* R. Ct. Fed. Cl. 12(h)(3).  The United States of America's Motion to Dismiss for Lack of Subject-Matter Jurisdiction, ECF No. 30, is consequently granted.

**I.    Background**

    **A. Factual History**[1]

The Mississippi Delta's mighty reach spans approximately the entire State of Mississippi.  *See Bd. of Supervisors of Issaquena Cnty., Mississippi v. United States*, 84 F.4th 1359, 1362 (Fed. Cir. 2023).  Northwards, the alluvial valley almost reaches the State of Tennessee.  *Id.*  Southwards, it hits Vicksburg, Mississippi, and creates the South Delta.  *Id.*  In the South Delta, the Mississippi River slams into the Yazoo River, forming an unmissable Y-convergence, known as the Yazoo Backwater Area.  *Id.*; *see also* Second Am. Compl. at 1.  Smack-dab between this Y-convergence is Issaquena County—which the Board governs.  *See* Second Am. Compl. at 1.

Issaquena County "is one of the poorest counties, in one of the poorest states in the United States of America."  *Id.*  Sparsely populated, its land is tilled for "agricultural uses, including large swaths of farm and timber land."  *Id.*  But the County has a consistent problem: the South Delta itself.  *Id.* at 4–9; *see also Bd. of Supervisors of Issaquena Cnty., Mississippi*, 84 F.4th at 1362. "The Delta has often been flooded by its surrounding rivers, at times compounded by storms resulting from its proximity to the Gulf of Mexico," and at issue here, the Y-convergence's recurrent backwater flooding.  *Bd. of Supervisors of Issaquena Cnty., Mississippi*, 84 F.4th at 1362 (citing *United States v. Sponenbarger*, 308 U.S. 256, 260 (1939)).  Backwater flooding occurs when the dominant river in a Y-convergence, here, the Mississippi, rises faster than its tributary river, here, the Yazoo, making the tributary river surge to match the dominant river's water level.  *Id.*; *see* Second Am. Compl. at 5.  According to the Board, this

---

[1] "The facts in this section derive from the [Second Amended C]omplaint, the parties' submissions (including attached exhibits), and matters of which the [C]ourt may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence." *Whiteland Holdings, L.P. v. United States*, 141 Fed. Cl. 702, 705 n.1 (2019), *aff'd sub nom. Frazer/Exton Dev., L.P. v. United States*, 809 F. App'x 866 (Fed. Cir. 2020).  "A court may take judicial notice of a fact only when it is either 'generally known' or 'accurately and readily [discernible] from sources whose accuracy cannot reasonably be questioned.'" *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1378 (Fed. Cir. 2017) (quoting Fed. R. Evid. 201(b)).  "Judicial notice of public records is appropriate when considering a motion to dismiss." *Diversified Grp., Inc. v. United States*, 123 Fed. Cl. 442, 453 n.7 (2015) (collecting sources), *aff'd*, 841 F.3d 975 (Fed. Cir. 2016).

process has been exacerbated by the construction and operation of the Yazoo Backwater Project.  *See* Second Am. Compl. at 2–3.

The Yazoo Backwater Project is a product of tragedy.  In 1927, the colloquially-named 'Great Flood' struck communities on the Mississippi, including Issaquena County.  *Id.* at 4–5.  As the Great Flood progressed, the Mississippi swelled, water crested the tops of levees from New Orleans to Missouri, and then after months of rain, several levees burst.  *See Sponenbarger*, 308 U.S. at 260–61; Susan Scott Parrish, *The Great Mississippi Flood of 1927 Laid Bare the Divide Between the North and the South*, SMITHSONIAN MAGAZINE, https://www.smithsonianmag.com/history/devastating-mississippi-river-flood-uprooted-americas-faith-progress-180962856/ (last accessed on Dec. 3, 2024).  Across ten states, "every house, every barn, every outbuilding of every nature, even the fences were swept away" by the Great Flood.  *Sponenbarger*, 308 U.S. at 261 (internal quotation marks omitted).  In total, the Great Flood submerged sixteen million acres of land and displaced 600,000 people.  *See* Parrish, *supra* at 3.  Confronted with "the most destructive river flood in U[nited] S[tates] history," *id.*, Congress responded by passing the Flood Control Act of 1928, which authorized the Army Corps of Engineers to design a predecessor of the Yazoo Backwater Project:  A "'comprehensive ten-year program for the entire [Mississippi] valley, embodying a general bank protection scheme, channel stabilization and river regulation, all involving vast expenditures of public funds.'"  *Bd. of Supervisors of Issaquena Cnty., Mississippi*, 84 F.4th at 1362 (quoting *Sponenbarger*, 308 U.S. at 262).  The Army Corps of Engineers decided to install additional Mississippi River levees.  *Id.*; *see also* Second Am. Compl. at 4–5.

Adding levees was not a miracle cure, however, for those in the Mississippi Delta.  *Sponenbarger*, 308 U.S. 256, 261 ("Recurrent floods, even after the eventual completion of this tremendous undertaking, led to the conclusion that levees alone, though continuous, would not protect the valley from floods.").  "The government recognized that the improved Mississippi levees, by retaining more water in the river, led to more flood risk in the area between the" Yazoo Backwater Area, including Issaquena County.  *Bd. of Supervisors of Issaquena Cnty., Mississippi*, 84 F.4th at 1362.  So, in 1936, Congress approved the Eudora Floodway to direct the Mississippi's overflow waters to the Gulf of Mexico.  *Id.* (citing 33 U.S.C. § 702a-2).  But the Eudora Floodway was never built.  *Id.* (congressionally "abandoned" by statute).  In its place, the Congress funded the Yazoo Backwater Project, "a new levee system," for the South Delta.  *Id.* at 1362–63; *see* Second Am. Compl. at 4–5.

Running up thirty miles northeast from the Y-convergence and enclosing the Yazoo River Area's total 4,093 square mile drainage basin, the Yazoo Backwater Project is a massive series of floodgates intersecting miles of concrete walls.  *See* Second Am. Compl. at 5–6; *Bd. of Supervisors of Issaquena Cnty., Mississippi*, 84 F.4th at 1363.  But, according to the Board, the levee system's colossal scope obscures a devastating feature:  Once the floodgates are closed, to prevent backwater flooding during rainy periods, "any additional precipitation that falls within the 4,093 square mile drainage area becomes trapped behind the floodgates . . . and is unable to drain," thereby

"causing potential several and prolonged flooding of" Issaquena County. Second Am. Compl. at 6. From this structural and operational choice, the Board maintains, the Yazoo Backwater Project has led to "greater" flooding and damage to the Board's land and infrastructure—"roads, bridges, culverts, drainage systems . . . levees," and the like—because the Army Corps of Engineers "intentionally cut-off the natural drainage," via "creeks, streams, and other tributaries" within the South Delta. *Id.* at 6–7. In short, according to the Board, by both blocking and irreparably altering these tributaries, the Yazoo Backwater Project causes—once the floodgates are closed—"floodwaters [to] remain on the Board's property for a longer period of time and to a greater depth than . . . would have [occurred had] the" levee system never been built. *Id.* To the Board, this flow of events produced a taking under the Fifth Amendment when Issaquena County flooded between 2018 and 2019. *Id.* 10–13.

Or really, under the Board's cause-of-action theory, the Yazoo Backwater Project's operation has caused takings over decades—given that, since the levee system's completion, Issaquena County has flooded *at least* fourteen times. *See* Def.'s Mot. at, 7–9, 15–18 (relying on data from U.S. ARMY CORPS OF ENG'RS, FINAL SUPPL. NO. 2 TO THE 1982 YAZOO AREA PUMP PROJECT FINAL ENVIRONMENTAL IMPACT STATEMENT App. G (2020) ("2020 Report")). While the Board only focuses on the flooding's most recent iteration that occurred during 2018 and 2019, *see* Second. Am. Compl. at 8, public records demonstrate, as illustrated by the chart below, that Issaquena County has been repeatedly flooded with consistent severity for almost fifty years since the completion of the Yazoo Backwater Project:

| Year | Riverside: Max elevation at Steele Bayou | Landside: Max Elevation at Steele Bayou | Days of Backwater Area flooding (above 80') |
|---|---|---|---|
| 1979 | 97.2 | [not recorded] | 104 |
| 1983 | 98.5 | 95.8 | 73 |
| 1984 | 94.5 | 92 | 81 |
| 1993 | 91.5 | 91.5 | 130 |
| 1997 | 98.2 | 93.3 | 101 |
| 1998 | 91.6 | 88.3 | 89 |
| 2002 | 93.7 | 88 | 49 |
| 2003 | 91 | 88.3 | 23 |
| 2005 | 92.8 | 90 | 57 |
| 2008 | 100 | 92.2 | 156 |
| 2009 | 96.6 | 93.7 | 148 |
| 2011 | 106.2 | 90 | 132 |
| 2013 | 92.3 | 90.9 | 79 |
| 2015 | 94.1 | 90.6 | 145 |
| 2016 | 99.3 | 92 | 202 |
| 2017 | 97.1 | 88.5 | 53 |
| 2018 | 99 | 95.1 | 81 |
| 2019 | 100 | 98.2 | 219 |

*See* Def.'s Mot. at 7–9, 15–18 (citing the 2020 Report); *see also* Oral Argument Transcript 6:14–8:10 [hereinafter Oral Arg.].  In fact, in 2008, when floodwaters were nearing ninety feet, *The New York Times* reported from Steele Bayou, Mississippi, located in Issaquena County, that during torrential rainfall:

> The area of the lower [Mississippi] Delta is like the end of a bathtub near the drain. When the waters of the Mississippi River reach flood stage, where they are now, they back up into the Yazoo River.  As the Yazoo reverses its flow, the gates in the large drainage structure [of the Yazoo Backwater Project] close, plugging the bathtub and keeping out the Yazoo backwater.  But when the gates are closed, runoff from the upper [Mississippi] Delta does not drain into the Mississippi.

Felicity Barringer, *Death Looms for a Flood-Control Project*, N.Y. TIMES (Apr. 9, 2008), https://www.nytimes.com/2008/04/09/us/09yazoo.html (last accessed on Dec. 3, 2024) (paragraph break deleted).  In other words—from the Army Corps of Engineers' reports to *The New York Times*' reporting—multiple public sources routinely and prominently announced that Issaquena County, Mississippi's recurrent flooding has been an issue for over forty years.  *See id.*; Def.'s Mot. at 7–9, 15–18 (citing 2020 Report); Oral Arg. 6:14–8:10.

Just the same, the Board chooses to now bring its Fifth Amendment taking claim against defendant.  *See generally* Second. Am. Compl.

### B.  Procedural History

On June 9, 2022, the Court originally dismissed the Board's first amended complaint's previous two claims for failure to state a claim.  *See Bd. of Supervisors of Issaquena Cnty. v. United States*, 160 Fed. Cl. 300, 302, 304–07 (2022); *see generally* First Amended Complaint, ECF No. 9.  As to the first claim, the federal government inaction—there, the Army Corp of Engineers' "failure to construct backwater pumps, a floodway for alternative drainage, or the Yazoo Backwater Project as originally planned"—cannot serve as a basis for a Fifth Amendment Taking Clause claim and thus was dismissed for this reason.  *Bd. of Supervisors of Issaquena Cnty., Mississippi*, 160 Fed. Cl. at 305.  And as to the second claim, the Board failed to "allege sufficient facts to support that the government's construction and operation of the Yazoo Backwater Project caused more flood damage to plaintiff's property than if the project had never been built" and thus was dismissed for this reason.  *Id.* at 306.

On July 14, 2022, the Board appealed this Court's dismissal to the United States Court of Appeals for the Federal Circuit ("Federal Circuit").  *See generally* Plaintiff's Notice of Appeal, ECF No. 17.  On August 4, 2023, the Federal Circuit issued its opinion agreeing that "the Board's complaint failed to state a claim," but remanding so that the Board could allege a new theory of causation.  *See Bd. of Supervisors of Issaquena Cnty., Mississippi*, 84 F.4th at 1361.  According to the Federal Circuit, this Court did not err in dismissing both counts for failure to state a claim.  *Id.* at 1367; *see*

*also id.* at 1370 ("The Claims Court did not abuse its discretion here, and not even the Board suggests it did."). Indeed, "as the Board effectively admits, if the [Yazoo] Backwater Project had not been there, the [County] would almost certainly have been struck with backwater flood[waters] . . . in 2019" because the flooding then was the worst in almost a century. *Id.* Accordingly, the Federal Circuit reaffirmed its longstanding principle that to cause a taking, the government's actions must have "led to worse rainwater flood than would have occurred in" the Yazoo Backwater Project's "absence." *Id.* at 1368. The Federal Circuit also reaffirmed that government inaction cannot create a Fifth Amendment claim. *Id.* at 1365. Still, the Federal Circuit remanded to "provide the Board an opportunity to seek leave to amend *one last time* and attempt to state a plausible takings theory based on government action." *Id.* at 1370 (emphasis added).

After the case had been remanded, on September 29, 2023, the Board moved to amend its complaint. *See generally* Plaintiff's Motion to Amend Complaint, ECF No. 22. On October 13, 2023, defendant opposed the amendment as futile. *See generally* Defendant's Response to Motion to Amend Complaint, ECF No. 23. The Board did not file a reply. On April 24, 2024, the Court granted leave to amend. *See generally* Order Granting Plaintiff's Motion to Amend Complaint, ECF No. 26. On May 8, 2024, the Board filed its second amended complaint, now asserting that the Yazoo Backwater Project's construction and operation resulted in exacerbated flooding and thus is a taking under the Fifth Amendment. *See generally* Second Am. Compl. That complaint is the operative pleading. *See generally* Reported Order denying Defendant's Motion to Strike Plaintiff's Second Amended Complaint, ECF No. 44.

On June 5, 2024, defendant moved, as relevant here, to dismiss the Board's second amended complaint for lack of subject-matter jurisdiction and for failure to state a claim. *See generally* Def.'s Mot.

On July 3, 2024, the Board filed its opposition to defendant's motion to dismiss. *See generally* Plaintiff's Response to the Motion the Dismiss, ECF No. 35 [hereinafter Pl.'s Resp.]. On July 26, 2024, defendant replied in support of its motion to dismiss. *See generally* Defendant's Reply in support of Its Motion to Dismiss, ECF No. 40 [hereinafter Def.'s Reply]. On September 25, 2024, the Court held oral argument. The Court now issues its decision on the sufficiency of the second amended complaint.

## II.   Legal Standard[2]

Under the Tucker Act, the Court may "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an expressed or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). "[I]n order to come within the jurisdictional reach . . . [of] the Tucker Act, a plaintiff must

---

[2]   *See Progressive Indus., Inc. v. United States*, 888 F.3d 1248, 1253 n.4 (Fed. Cir. 2018) (holding that "[t]he precedent interpreting the Federal Rules of Civil Procedure applies with equal force to the comparable Rules of the Court of Federal Claims." (internal citations omitted)).

identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). Indisputably, "the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction." *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).

All Fifth Amendment taking claims evoking the Tucker Act must be "filed within six years after such claim first accrues." 28 U.S.C. § 2501; *see Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1578 (Fed. Cir. 1988) ("Since the [six]–year period is also an express condition of the government's consent to be sued, courts are without jurisdiction to expand that period explicitly provided by Congress, at least on the equitable grounds of waiver or estoppel."). Once the federal government "appropriate[s] private property for public use without just compensation" *and* the "the plaintiff was or should have been aware of" the unconstitutional appropriation, *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000), all the prerequisites have occurred "to enable the plaintiff to bring suit, [and] entitling the claimant to demand payment and sue here for his [or her] money," *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc) (internal quotation marks omitted). Thus, accrual begins on the date in "which the plaintiff's land has been clearly and permanently taken," *Boling*, 220 F.3d at 1370, according to an "objective" reasonable person in plaintiff's position, *see Grass Valley Terrace v. United States*, 46 Fed. Cl. 629, 633 (2000), *aff'd*, 7 F. App'x 928 (Fed. Cir. 2001); *see also Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995) ("The question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue.").

But marking the "exact moment" of when the Tucker Act's timer begins can be a finicky evaluation. *Boling*, 220 F.3d at 1370. For instance, despite the Court's "absolute" six-year statutory bar, *John R. Sand & Gravel Co.*, 552 U.S. at 135, "[w]hen a taking occurs by a gradual or continuous physical process," such as with recurrent flooding or erosion, a Fifth Amendment claim only "accrues when the condition 'stabilizes,'" *Swartzlander v. United States*, 142 Fed. Cl. 435, 443 (2019) (quoting *Mildenberger v. United States*, 643 F.3d 938, 945 (Fed. Cir. 2011)), *aff'd*, 811 F. App'x 616 (Fed. Cir. 2020).

"[S]tabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined." *Boling*, 220 F.3d at 1370–71. After all, "[t]he source of [the plaintiff's] entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous." *United States v. Dickinson*, 331 U.S. 745, 749 (1947). Therefore, stabilization only delays that statutory bar *until* the flooding has "substantially and permanently invaded the private property" to the extent that the taking's nature is evident and is reasonably foreseeable to reoccur, *see Boling*, 220 F.3d at 1371, *rather than* when flooding ceases or when flooding is at its "most painful," *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (internal quotation marks omitted); *see Boling*, 220 F.3d at 1371 ("The contention . . . [that] the

filing of a [Fifth Amendment Taking Clause] lawsuit can be postponed until the full extent of the damage is known has been soundly rejected."). That said, "the plaintiff need not sue" if the "gradual process" has not become an evident taking, *Boling*, 220 F.3d at 1371, such as if "it [is] uncertain at what stage in the flooding operation that land had become appropriated for public use," *United States v. Dow,* 357 U.S. 17, 27 (1958) (noting the "expressly limited holding in [*United States v.*] *Dickinson*" (emphasis added)).

At bottom, if a Fifth Amendment taking claim is brought after six years of accrual, the claim must be dismissed for lack of subject-matter jurisdiction. *See* R. Ct. Fed. Cl. 12(h)(3). When subject-matter jurisdiction is challenged, the plaintiff "bears the burden of establishing the [C]ourt's jurisdiction over its claims by a preponderance of the evidence." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). Jurisdictionally determinative evidence includes "all undisputed facts asserted in the plaintiff's complaint," *id.*, and any relevant evidence outside the complaint, *see Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988), including judicially noticeable public records, *see Diversified Grp., Inc.*, 123 Fed. Cl. at 453 n.7 (collecting sources).

### III.     Discussion

The Board's claim requires dismissal. It is incurably tardy. For almost fifty years since the Yazoo Backwater Project's construction and the Army Corps of Engineers operation thereof, the Mississippi Delta has continuously flooded Issaquena County, Mississippi. *See* Def.'s Mot. at 7–9, 15–18 (citing 2020 Report); Oral Arg. 6:14–8:10; Barringer, *supra*, at 5. No objective reasonable person—let alone a body governing a county—would be without notice of a possible taking of the Board's property; or at least the Board *should have been aware* of a possible taking due to the publicly noticed recurrent floods over almost a half-century since the Yazoo Backwater Project's construction. *E.g.*, Barringer, *supra*, at 5 (describing extensive flooding in 2008 within Issaquena County, Mississippi); *see Whiteland Holdings, L.P.*, 141 Fed. Cl. at 712 (holding that a plaintiff "could not delay the accrual of [its] claim . . . when [it] had access to all of the necessary facts—by virtue of those facts being in the public record, as well as [the plaintiff's] actual knowledge of those facts—giving rise to [its] claim."). For that reason, the Tucker Act's six-year statute of limitations has run out, *see* 28 U.S.C. § 2501, and dismissal is required, *see* R. Ct. Fed. Cl. 12(h)(3).

"Statute of limitations are vital to the welfare of society and are favored in the law." *Wood v. Carpenter*, 101 U.S. 135, 139 (1879). By forcing an allegedly harmed party to assert his or her claim(s) before a deadline, accused parties can neither waive away disputes without good cause nor be unshielded from boundless liability. Of course, deadlines have tradeoffs: "Mere delay," by even a single day past the statutory deadline, "is itself a conclusive bar" to a harmed party's cause-of-action, regardless of its validity. *Id.* Clarity, therefore, aids, but also forces a "[s]tale conflict[]" to "rest undisturbed" once the deadline passes. *Dayco Corp. v. Goodyear Tire & Rubber Co.*,

523 F.2d 389, 394 (6th Cir. 1975); *see also Wood*, 101 U.S. at 139 ("The bane and antidote go together.").

This Court's deadline is six years. 28 U.S.C. § 2501. Failure to file an accrued claim by this deadline "places the claim beyond the [C]ourt's power to hear" it because, if not timely filed, the Tucker Act's limited jurisdictional wavier of sovereign immunity would be violated. *Gromo v. United States*, No. 93-5161, 1993 WL 456408, at *1 (Fed. Cir. 1993) (per curiam) (citing *Jones v. United States*, 801 F.2d 1334, 1335 (Fed. Cir. 1986), *cert. denied*, 481 U.S. 1013 (1987)); *Martinez*, 333 F.3d 1295, 1303 (en banc) ("It is well established that statutes of limitations for causes of action against the United States, being conditions of the waiver of sovereign immunity, are jurisdictional in nature."); *see also John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1354 (Fed. Cir. 2006) (collecting cases), *aff'd*, 552 U.S. 130 (2008). Thus, claimants' cases are blocked if brought after six years of accrual. 28 U.S.C. § 2501.

More than forty years has elapsed since 1979, when the County experienced its first flood after the construction of the Yazoo Backwater Project. *See* Def.'s Mot. at 7–9, 15–18 (citing 2020 Report); Oral Arg. 6:14–8:10; *see also* Pl.'s Resp. at 4–5 (relying upon the 2020 Report to argue that the statute of limitations does not apply). And these floods were not blips; they were monthslong slogs. Oral Arg. 6:25–7:1 ("Nor was this flooding brief. It was readily apparent."). The 1979 flood lasted around three months. *See* Def.'s Mot. at 8, 16 (citing 2020 Report). After a short reprieve, monthslong flooding returned in 1983, in 1984, and in 1993. *Id.* In 1993 alone, the Yazoo Backwater "[P]roject gates [were] closed . . . [for] more than four months." Oral Arg. 7:1–7:3. "In 1997, [flooding] lasted [for] more than three months." *Id.* at 7:3. The same was true in 1998. *See* Def.'s Mot. at 8, 16 (citing 2020 Report). Surely our new millennium brought many changes, but Issaquena County still saw monthslong flooding in both 2002 and 2005. *Id.* Floods returned in 2008 and 2009 and "lasted [for] about five months," Oral Arg. 7:4, causing *The New York Times* to remark upon Issaquena County's continual desperate condition, *see* Barringer, *supra*, at 5. "[A]nd in 2011, [flooding] lasted [for] more than four months." Oral Arg. 7:4–7:5. Recurrent monthslong flooding—an unmissable situation for a Board "responsible for the general operation and government function of Issaquena County," *see* Second. Am. Compl. at 6—once again returned in 2013, in 2015, in 2016, in 2017, and between 2018 and 2019, *see* Def.'s Mot. at 8, 15–18 (citing 2020 Report).

In other words, sustained flooding is the norm in Issaquena County. No "objective" individual or governing entity, *Grass Valley Terrace*, 46 Fed. Cl. at 63, in the Board's position, would be oblivious of "actual knowledge of all the relevant facts in order for the cause of action to accrue," *Fallini*, 56 F.3d at 1380. Rather, steering Issaquena County through each ordeal is standard for the Board and, therefore, it possessed the "means" to discover a Fifth Amendment taking violation due to the Yazoo Backwater Project's operation, meaning the closing of the floodgates, decades before the Board filed its claims. *Wood*, 101 U.S. at 143 ("[T]he means of knowledge are the same thing in effect as knowledge itself."); *e.g.*, *Gromo*, 1993 WL 456408, at *2 (affirming a dismissal for violating the Tucker Act's statute of limitations because the

plaintiff had the means to discover his claim had accrued); *see* Oral Arg. 8:11–8:19 ("[The Board] has conceded this point. [It] did not address or respond to these public sources or the [defendant's] argument based on them. But more than that, these public sources show that a reasonable inquiry . . . would have led them to discover their alleged claim."). Literally, the Court could randomly select a flood year—be it 1979, 1983, 2002, or 2013—and still, the Board would be late by years under the Tucker Act's six-year allowance. 28 U.S.C. § 2501. This point is true because monthslong flooding—especially, as alleged, severely damaging flooding that reoccurred over decades—is not hidden. *See generally* Second Am. Compl. Quite the opposite, really, and this Court will not pretend otherwise.

The stabilization doctrine reinforces this conclusion. Flooding is obviously a "continuous" process: A river's water level rises, then falls, and might even rise again before finally receding. *See Dickinson*, 331 U.S. at 749. Put simply, pinpointing when flooding becomes a taking can be an imprecise endeavor, sometimes permeated with "uncertain[ty]." *Dow,* 357 U.S. at 27. Accordingly, the stabilization doctrine accounts for nature's "diverse circumstances" by "avoid[ing]" technocratic "rigidities" in enforcing statutory deadlines. *Id.* Only when a flood's continuous process becomes evident and is reasonably foreseeable to reoccur on plaintiff's property—*i.e.*, likely to damage or invade the Board's property again—does the taking stabilize and the statutory timer start. *See Boling*, 220 F.3d at 1371; *cf. Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2450 (2024) ("A right of action 'accrues' when the plaintiff has a 'complete and present cause of action'—*i.e.*, when [he or] she has the right to 'file suit and obtain relief.' . . . [S]o the statute of limitations does not begin to run until [he or] she is injured." (quoting *Green v. Brennan*, 578 U.S. 547, 554 (2016) (internal quotation marks omitted)).

The Board's alleged injury has been apparent for some time. As discussed thoroughly in this opinion, Issaquena County—which, it cannot be overemphasized, is governed by the Board—has suffered repeated monthslong flooding potentially originating from the Yazoo Backwater Project. *See* Part I.A., *supra*, at 2–5; *see also* Second. Am. Compl. at 6. The Army Corp of Engineers has been aware of this issue for years, *see* Def.'s Mot. at 7–9, 15–18 (citing 2020 Report), as has the public, *see* Barringer, *supra*, at 5. Even the federal judiciary has been aware of similar issues in the Mississippi Delta. *E.g.*, *State of Mississippi v. United States*, 173 Fed. Cl. 91, 101 (2024) (holding that the State of Mississippi's suit was barred because "the alleged [flood] taking was evident—and thus, the six-year limitations period began to run—well before February 2013" when the State of Mississippi filed suit). So, it belies commonsense that Issaquena County's Board just now—almost fifty years later after the first post-Yazoo Backwater Project flood—discovered its Fifth Amendment taking claim. *Cf. Gromo*, 1993 WL 456408, at *2 (holding that the appellee "failed to carry his burden of proving that the facts underlying his claim were inherently unknowable because it is reasonable to conclude that such facts could have been uncovered in the exercise of due diligence." (internal quotation marks omitted)). At minimum, the Board should have had an inkling that something was amiss and used its governmental

"means" to discover that a taking may have occurred. *E.g.*, *id.*; *see Wood*, 101 U.S. at 143. But for over forty years, the Board never pressed its rights.

"The contention [offered by the Board that] the filing of a [Fifth Amendment Taking Clause] lawsuit can be postponed until the full extent of the damage is known has been soundly rejected," *Boling*, 220 F.3d at 1371; *compare id.*, *with* Pl.'s Resp. at 3–5, *and* Def.'s Reply at 2–4, meaning the Board's taking injury does need to reach its maximum harm for the statutory timer to begin, *see Delaware State Coll.*, 449 U.S. at 258. The Court instead focuses "upon the time of the [defendant's] acts, *not* upon the time at which the consequences of the acts become most painful." *Id.* (emphasis added). As applied, the time when defendant's Yazoo Backwater Project actions were clear was, at minimum, in 2008—the year *The New York Times* reported about the Yazoo Backwater Project's floodgates exacerbating flooding in Issaquena County, Mississippi—which would have put the six-year statutory deadline around 2014. *See* Barringer, *supra*, at 5. Pointing to Issaquena County's "worse 'backwater' flood in [its] history," *see* Pl.'s Resp. at 4, is therefore "beside the point," *see* Def.'s Reply at 3. A new and worse flood, as both the Federal Circuit and this Court have repeatedly emphasized, does not reset the Tucker Act's statutory deadline; stabilization only tolls the statute of limitations when it is unclear if a government action, *not* nature's actions, is potentially causing the flooding. *See Boling*, 220 F.3d at 1371. Defendant controls many things, but rain patterns are not in its wheelhouse. The Board, as a result, should have sued far earlier.

Ultimately, Mark Twain wrote it best: "You cannot surprise an individual more than twice with the same marvel." MARK TWAIN, LIFE ON THE MISSISSIPPI 487 (1917). Issaquena County's marvel—disastrous recurrent flooding—has come not once, not twice, not thrice, but *at least* fourteen times over the forty years since the Yazoo Backwater Project's construction. The Board therefore has been on clear notice to sue for a taking—if one really exists. *Fallini*, 56 F.3d at 1380. But it did not do so. The Tucker Act's six-year statute of limitations, accordingly, slams its "absolut[ist]" courtroom door to the Board's forty-five-year-old claim. *John R. Sand & Gravel Co.*, 552 U.S. at 135.

\* \* \*

Because the Board's claim is statutorily barred, the Court will not address the "plausibility" of its claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 560 (2007). That said, like defendant, the Court seriously doubts that the Board explained "how the [Yazoo Backwater] Project . . . physically execrated flooding" in the County as required by the Federal Circuit. *Bd. of Supervisors of Issaquena Cnty., Mississippi*, 84 F.4th at 1369; *see also* Def.'s Mot. at 19–29 (moving to dismiss for failure to state a claim under RCFC 12(b)(6)). It seems this 'but-for' inquiry is still missing in the complaint—a determination that, like previously, would prove fatal. *E.g.*, *Bd. of Supervisors of Issaquena Cnty.*, 160 Fed. Cl. at 302, 304–07; *accord Sponenbarger*, 308 U.S. at 267 ("[T]he District Court justifiably found that the program of the 1928 Act has greatly reduced the flood menace to respondent's land by improving her protection from floods.

Under these circumstances, respondent's land has not been taken within the meaning of the Fifth Amendment."). The Court nonetheless refrains from analyzing further.

## IV.  Conclusion

Floodwaters recede and evaporate—but statutory deadlines are unwavering. Because the Board filed its suit decades late, dismissal for lack of subject-matter jurisdiction is required. *See* R. Ct. Fed. Cl. 12(h)(3). Despite the foregoing, the Board can pursue the Court's alternative congressional reference jurisdiction. Specifically, the Board could seek the United States Congress to require the Court provide Congress with an advisory opinion making recommendations on whether the Board's claim is meritorious or is seeking a mere "gratuity." 28 U.S.C. § 2509(c). Further information on this process may be found at 28 U.S.C. § 1492.

Defendant's Motion to Dismiss for Lack of Subject-Matter Jurisdiction, ECF No. 30, is **GRANTED**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*
Loren A. Smith,
Senior Judge